AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black Apple iPhone Cell Phone<br>Seized as FP&F No. 2023565300044601 Line Item 0003<br>("Target Device 2") | )<br>)<br>)<br>)<br>)<br>) |

Case No.   '23 MJ00980

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-1, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U. S. C. § 1324 | Alien Smuggling |

The application is based on these facts:

See Attached Affidavit of Border Patrol Agent Shawna M. Wilson, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Shawna M. Wilson, Border Patrol Agent, U.S. Border Patrol

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date:  03/21/2023

*Judge's signature*

City and state:  San Diego, California

HON. WILLIAM V. GALLO, U.S. Magistrate Judge

*Printed name and title*

**1**

## <u>ATTACHMENT A-2</u>

**2**

PROPERTY TO BE SEARCHED

**3**   The following property is to be searched:

**4**   Black Apple iPhone Cell Phone
Seized as FP&F No. 2023565300044601 Item 0003
**5**   **("Target Device 2")**

**6**   Target Device is currently in the custody of the Department of Homeland Security,
Customs and Border Protection, United States Border Patrol, San Diego Sector.

**7**

**8**

**9**

**10**

**11**

**12**

**13**

**14**

**15**

**16**

**17**

**18**

**19**

**20**

**21**

## ATTACHMENT B

ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A-1, A-2, and A-3 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below.   The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **February 15, 2023, through March 15, 2023**:

 a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

 b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

 c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

 d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

 e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

 f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.

16

1

## **AFFIDAVIT**

2

I, Shawna M. Wilson, being duly sworn, hereby state as follows:

3

## **INTRODUCTION**

4

1.   I submit this affidavit in support of an application for a warrant to search the following electronic devices:

5

6

Dark Blue Apple iPhone Cell Phone
Seized as FP&F No. 2023565300044601 Item 0002
**("Target Device 1")**

7

8

Black Apple iPhone Cell Phone
Seized as FP&F No. 2023565300044601 Item 0003
**("Target Device 2")**

9

10

Blue Samsung Cell Phone
Seized as FP&F No. 2023565300044601 Item 0004
**("Target Device 3")**

11

12

the **Target Devices**, as further described in Attachment A-1, A-2, and A-3 and to

13

seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

14

2.   The requested warrants related to the investigation and prosecution of David

15

Eduardo ROMERO-Lopez and Herbin Samuel BARILLAS-Landaverde for attempting to transport and move illegal aliens within the United States. The **Target Devices** are

16

currently in the custody of Department of Homeland Security, Customs and Border

17

Protection, United States Border Patrol, San Diego Sector.

18

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement

19

personnel and witnesses, including my review of reports prepared by other law

20

enforcement officers and agents.  This affidavit is intended to show that there is sufficient

21

1

probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter.   Dates and times are approximate.

## TRAINING AND EXPERIENCE

4.      I have been employed by the USBP since 2019 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for four years.  I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants.  I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.      My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6.      During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7.      Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational

2

habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8.      The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media,

3

or messaging applications when contact is lost with the driver after an apprehension has occurred.

9.      Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10.     This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

> a.  tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;
>
> b.  tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;
>
> c.  tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;
>
> d.  tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On March 15, 2023, Border Patrol Agents J. Serrato, C. Torres, and C. Ortiz were performing assigned duties in the Brown Field Border Patrol Station's area of responsibility. Agent Torres was wearing a full rough duty uniform and Agent Ortiz was in plain clothes with his agency issued badge displayed.

12. At approximately 11:30 AM, Agent Serrato was responding to a seismic intrusion device activation near Bee Canyon Road, when he observed a white Chevrolet Malibu traveling at a high rate of speed away from the approximate location of the seismic intrusion device. Agent Serrato notified other agents in the field that the Malibu turned to go west onto State Route 94 (SR94). Agent Ortiz observed the Malibu pass his location, and requested record checks on the Malibu. The record checks revealed that the Malibu was registered out of Arleta, California, which is near Los Angeles, California which is approximately 144 miles north of San Diego, California and did not have any recent prior crossings at any International Port of Entry.

13. At approximately 11:40 AM, Agent Ortiz requested a marked Border Patrol vehicle to assist with a vehicle stop. Supervisory Border Patrol Agent S. Moran responded, but due to traffic conditions, Agent Moran was directly in front of the Malibu at which time Agent Torres requested for an additional marked unit to assist with a vehicle stop. As all the Agents and the Malibu were approaching the SR94 Border Patrol Checkpoint, Agent Moran activated his emergency lights and sirens in front of the Malibu to conduct a vehicle stop at the SR-94 Checkpoint. Agent Moran exited his vehicle but the driver of the Malibu, later identified as the defendant, David Eduardo ROMERO-Lopez, sped away from Agent Moran, failing to yield. ROMERO then traveled into oncoming traffic and struck the

5

drivers' side rear portion of Border Patrol Agent Mendevil's K9 truck. Agent Mendevil then checked his K9 partner for injuries, but she didn't appear to be seriously injured. ROMERO then crashed into a light pole on the south side of SR94, and and the other passengers then bailed out of the Malibu and ran away.

14.    At approximately 11:50 AM, Agent Ortiz arrived at the the crash and observed an individual, later identified as material witness, Rosa SANTACRUZ-Hernandez, running from the Malibu. Agent Ortiz instructed SANTACRUZ to sit down and then turned his attention to ROMERO, the driver of the Malibu, who was still sitting in the vehicle. Agent Ortiz instructed ROMERO to exit the vehicle. At approximately 11:52 AM, Agent Ortiz placed ROMERO under arrest.Agent Ortiz then assisted in detaining the front seat passenger, later identified as the co-defendant Herbin Samuel BARILLAS-Landaverde. Agent Torres then conducted an immigration inspection, and BARILLAS stated that he is a citizen of Guatemala without any immigration documents allowing him to enter or remain in the United States legally. At approximately11:52 AM, Agent Torres placed BARILLAS under arrest.

15.    The two back seat passengers of the Malibu, SANTACRUZ, and one later identified as material witness Eric CASTANEDA-Flores who had also ran from the Malibu, were brought to the SR94 checkpoint detention area. Border Patrol Agent J. Michael then conducted an immigration inspection of CASTANEDA. CASTANEDA stated that he is a citizen of Mexico without any immigration documents allowing him to enter or remain in the United States legally. At 12:20 AM, Agent Michael placed CASTANEDA under arrest. Agent Michael then approached SANTACRUZ, treated her for her injuries, and conducted an immigration inspection. SANTACRUZ stated that she is a citizen of Mexico without any immigration documents allowing him to enter or remain in the United States legally. At 12:25 AM, Agent Michael placed SANTACRUZ under arrest.

16.     At the time of arrest, a dark blue Apple iPhone Cell Phone (**Target Device 1**), was recovered from the driver's side floorboard of the Malibu, a black Apple iPhone cell phone (**Target Device 2**) was found in the center console of the Malibu, and a blue Samsung cell phone (**Target Device 3**) was found in the glove box of the Malibu. All three devices were subsequently seized. ROMERO claimed that Target Device 1 and Target Device 2 were his. Target Device 3 was discovered later during an inventory search of the Malibu, and neither defendant was asked who Target Device 3 belonged to.

17.     The defendant, Herbin Samuel BARILLAS-Landaverde was read his Miranda Rights, and BARILLAS stated he understood his rights and was willing to speak without an attorney present. BARILLAS stated he is a citizen of Guatemala without any immigration documents allowing him to enter or remain in the United States legally. BARILLAS stated he last entered the United States around May, 2016, or 2017. BARILLAS stated a couple of weeks ago, a person contacted him on Instagram, and while he was hanging out with his friend ROMERO, the same person contacted him again on Instagram. BARILLAS stated this person explained that he had a job and needed drivers to pick up illegal aliens and transport them to San Diego, CA. BARILLAS stated the person told him he would get paid between $5,000-10,000 USD.  BARILLAS stated he discussed the alien smuggling job with ROMERO and stated that they agreed to do it because both needed the money. BARILLAS stated he contacted the person and told him they would do it. BARILLAS stated the person on instagram put him in contact with other people who told him to drive to a Starbucks in a shopping center in San Diego, CA.  BARILLAS claimed he and ROMERO remained in the same shopping center and slept in ROMERO's car. BARILLAS stated he does not remember the names or phone numbers of the people involved but claimed it was all in his cellphone.

18.     BARILLAS stated that he and ROMERO woke up at around 7:30 AM, and at about 9:00 AM, BARILLAS texted to inquire about the smuggling job. BARILLAS stated he received a pin-drop from the coordinators with the location where they were supposed

7

to pick up two illegal aliens. BARILLAS stated they would be paid $2,000 USD for the smuggling job, which he and ROMERO would later split half and half. BARILLAS stated the coordinators asked him to send them a photo of their car. BARILLAS stated they drove to the pickup location, and was told by the coordinators to yell the word "Muelas". BARILLAS stated that once at the pickup location, he and ROMERO yelled "Muelas" but not too loud. BARILLAS stated two illegal aliens emerged from the side of the road and got into the vehicle. BARILLAS stated the male illegal alien, told them they should be fine because the vehicle's windows were heavily fogged, and the Border Patrol won't see us. BARILLAS stated he gave sweaters to both illegal aliens, asked them to put on their seatbelts and lower their heads.

19.    BARILLAS stated they started driving back towards the main road, but after about five minutes, they saw a Border Patrol vehicle. BARILLAS stated he told ROMERO,"Pisale!" (Step on it!). BARILLAS stated they drove on the main road and back way they came. BARILLAS stated they passed a Suburban and saw it following behind them. BARILLAS stated further down the road was another Border Patrol vehicle. BARILLAS stated he told ROMERO to let the Border Patrol vehicle get in front of them, so they don't have to worry about being pulled over. BARILLAS stated that once they arrived at the checkpoint, the Border Patrol vehicle stopped immediately in front of them. BARILLAS stated the male illegal alien then said, "Acelera, acelera!" (Accelerate, accelerate!). BARILLAS stated ROMERO drove to try and get away, but there was a blue Border Patrol vehicle in front of them. BARILLAS stated that ROMERO tried swerving around it, but due to the vehicle speed, ROMERO impacted the rear corner of the blue vehicle and then crashed again. BARILLAS stated immediately after this, the male illegal alien exited the vehicle and took off running. BARILLAS stated everyone else remained in the car and were subsequently arrested.

20.    Agent Vega-Flores explained to BARILLAS that as part of the seizure process of the vehicle, a complete inventory was conducted, and an "item" was found by agents.

1   Agent Vega-Flores asked BARILLAS if he knew what Agent Vega-Flores was referring

2   to. BARILLAS stated "No." Agent Vega-Flores told BARILLAS that a pistol was found

in the vehicle. Agent Vega-Flores also reminded BARILLAS that lying to a federal agent

3   is a crime. BARILLAS admitted the pistol was his and described it as a 9MM Glock pistol,

4   with one magazine containing 8-10 rounds.

5        21.    Material Witnesses CASTANEDA and SANTACRUZ stated that they are

citizens of Mexico without any immigration documents allowing them to enter or remain

6   in the United States legally. CASTANEDA and SANTACRUZ stated that they were going

7   to pay between $9,000-10,000 USD to be successfully smuggled into the United States.

8   CASTANEDA and SANTACRUZ stated that they entered illegally into the United States

on March 15, 2023, between 6:00 AM and 9:00 AM. SANTACRUZ stated that her

9   intended destination in the United States was Los Angeles, California. CASTANEDA

10  stated that the foot guide told them there would be two load vehicles arriving at their

11  location. CASTANEDA and SANTACRUZ stated that they saw a white four door vehicle

arrive at their location and stop. SANTACRUZ stated that when the white car arrived at

12  their location, the driver honked and when they got in the vehicle, there was a driver and a

13  front passenger already in the vehicle. CASTANEDA and SANTACRUZ stated that both

14  the driver and the front passenger reassure them that everything would be fine.

CASTANEDA stated that once they made it to a paved road BARILLAS said "Ya estuvo"

15  (we've made it). CASTANEDA stated that he saw a Border Patrol vehicle slow down and

16  come to a stop in front of them. CASTANEDA and SANTACRUZ stated that BARILLAS

17  told ROMERO to keep going. CASTANEDA stated that ROMERO drove around the

Border Patrol vehicle and then tried to go around a truck blocking the road and eventually

18  crashed into a pole. SANTACRUZ stated that ROMERO drove for approximately one

19  minute before ROMERO crashed into a vehicle. SANTACRUZ stated she hit her head on

one of the back seats and felt warm blood run down her face. SANTACRUZ stated she

20  feared for her life and began to panic. CASTANEDA stated he feared for his life when the

21

1  driver went around the first Border Patrol vehicle. SANTACRUZ stated she was told to

2  exit the vehicle and kneel on the ground and that soon after kneeling, Border Patrol Agents

3  noticed SANTACRUZ was injured and began to help her.  When shown photographic

   lineups, CASTANEDA and SANTACRUZ were able to identify ROMERO as the driver

4  of the vehicle in this smuggling event.

5       22.    Based upon my experience and training, consultation with other law

   enforcement officers experienced in human trafficking investigations, and all the facts and

6  opinions set forth in this affidavit, I believe that telephone numbers, contact names,

7  electronic mail (email) addresses, appointment dates, messages, pictures, and other digital

8  information are stored in the memory of the **Target Devices**. In light of the above facts and

   my experience and training, there is probable cause to believe that the Defendant was using

9  the **Target Devices** to communicate with others to further illegal entry into the United

10 States.  Based on my training and experience, it is also not unusual for individuals, such as

11 the Defendant, to attempt to minimize the amount of time they were involved in their

   smuggling activities, and for the individuals to be involved for weeks and months longer

12 than they claim.  Accordingly, I request permission to search the **Target Devices** for data

13 beginning on **February 15, 2023, through March 15, 2023**.

14                              **METHODOLOGY**

15      23.    It is not possible to determine, merely by knowing the cellular telephone's

16 make, model and serial number, the nature and types of services to which the device is

   subscribed, and the nature of the data stored on the device. Cellular devices today can be

17 simple cellular telephones and text message devices, can include cameras, can serve as

18 personal digital assistants and have functions such as calendars and full address books and

   can be mini-computers allowing for electronic mail services, web services and rudimentary

19 word processing. An increasing number of cellular service providers now allow for their

20 subscribers to access their device over the internet and remotely destroy all of the data

21 contained on the device. For that reason, the device may only be powered in a secure

environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24.     Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

25.     Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

26.     Law enforcement has not previously attempted to obtain the evidence sought by these warrants.

**CONCLUSION**

27.     Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of an alien smuggling violation of Title 8, United States Code, Section 1324.

28.     Because the **Target Devices** were seized at the time of HERNANDEZ and RIOS' arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search is from **February 15, 2023, through March 15, 2023.**

29.     Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A-1, A-2, and A-3 seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Shawna M. Wilson
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 21st day of March 2023.

HON. WILLIAM V. GALLO
United States Magistrate Judge